Identification Numbers Redacted Pursuant to Rules 5.2 and 9(m)

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **Visa Inc. and Subsidiaries,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**The United States of America,**<br><br>**Defendant.** | **No.** _____ <br> 24-957 T |

## COMPLAINT

Plaintiff, Visa Inc. and Subsidiaries ("**Visa**"), brings this action against Defendant, the United States of America, seeking tax refunds for Visa's tax years ended September 30, 2008, September 30, 2009, September 30, 2010, September 30, 2011, September 30, 2012, September 30, 2013, September 30, 2014, and September 30, 2015.

In support of its claims, Plaintiff alleges as follows:

## NATURE OF THE DISPUTE

1.     Almost all American adults hold at least one debit or credit card, but few people understand how their card works. And, of those card-carrying adults, many have at least one Visa-branded card, but few people understand what Visa does or how it operates. Visa does not issue cards, extend credit, issue monthly statements, pull funds from consumers' deposit accounts, or post charges against their credit accounts. Rather, Visa is a payment network, which means it primarily does two things:  (1) Visa provides services to financial institutions related to the operation of the network, such as setting

1

network rules, engaging in marketing campaigns, etc. and (2) Visa develops and maintains software that financial institutions use to authorize, clear, and settle payment card transactions among themselves. It is this second prong of Visa's business that is at issue in this case.

2.     Visa is a technology company that has operated in Silicon Valley for over 50 years, when its first data center was opened in San Mateo, California. During that time, Visa has developed its suite of core transaction software, known as VisaNet. Visa initially developed its software to solve problems that members of the Visa network faced at that time—namely, the costs and burdens associated with authorizing transactions manually by telephone and with clearing and settling transactions using paper drafts mailed to data entry departments. Visa solved these problems, among others, with the VisaNet software solution, which Visa made available to its member financial institutions to digitally authorize, clear, and settle payment card transactions among themselves.

3.     Visa licenses the VisaNet software to its customer financial institutions, which have the right to use the VisaNet software to authorize, clear, and settle payment card transactions with one another. The license is set forth in Visa's Operating Regulations, a set of binding contractual provisions governing the relationship between and among Visa and its customer financial institutions.

4.     This tax refund case arises from a fundamental misunderstanding of what Visa is and what it does, which led to the IRS's improper denial of Visa's claims for the

domestic production activities deduction under former section 199 (the "**Section 199 Deduction**").[1]

5.      Congress enacted section 199 in 2004, but the legislation was first proposed in 2003. This meant it came in the shadow of the 2001 recession and its so-called "jobless recovery." Unprecedented trade liberalization was being blamed for the offshoring of American jobs. And those concerns were expanding: offshoring was beginning to affect white-collar jobs, such as software engineers. On top of that, the World Trade Organization had just ruled that what little export benefits America had (through the extraterritorial income exclusion regime) were a prohibited subsidy under the relevant trade agreements.

6.      Congress enacted section 199 to counteract these forces by incentivizing domestic production. In doing so, it went beyond prior subsidies that applied only to exports and broadly allowed taxpayers to deduct part of their income from producing things in the United States. Congress also went beyond traditional concerns about manufacturing jobs and specifically provided for section 199 to apply broadly to "***any*** software" produced in the United States. Congress's hope was that the new incentive would both create new jobs and preserve existing jobs.

7.      Visa was precisely the type of taxpayer that Congress intended to benefit through section 199. Offshoring trends were accelerating. Yet Visa continued to employ hundreds of software engineers in the United States. And these were not just any jobs.

---

[1] Unless noted otherwise, (a) all "section" references are to the Internal Revenue Code (26 U.S.C.) as in effect during the years in issue and (b) all "Treas. Reg." references are to Title 26 of the Code of Federal Regulations as in effect during the years in issue.

For example, in 2014, the average base salary of a Visa software engineer was $131,539, nearly three times the average net compensation for U.S. workers.[2]

8.      Among the things that the Visa software engineers produced were what we refer to here as the VisaNet and Cybersource software:

  a.  **VisaNet software.** The VisaNet software was a suite of programs used by (i) the third-party customer financial institutions that issue Visa-branded cards or payment products to account holders ("**Issuers**") and (ii) the third-party customer financial institutions that contract with merchants to accept Visa-branded cards or payment products ("**Acquirers**"). Issuers and Acquirers used the VisaNet software to process data for cardholder transactions.

  b.  **Cybersource software.** The Cybersource software was used by e-commerce merchants. Those merchants used the Cybersource software to accept electronic payments and to connect with acquirers for various payment networks (including Acquirers in the Visa network).

9.      Visa claimed the section 199 deduction for only part of its income derived from the VisaNet and Cybersource software. Specifically, Visa claimed the deduction only for data processing fees derived solely from the use of the software (by Issuers, Acquirers, and merchants). Visa did not claim the deduction for fees related to functions performed (in whole or in part) by Visa personnel, regardless of the relative importance of the human and software functions. Nor did Visa claim the deduction for any of its card service fees, which constituted approximately half of its total income. In short, Visa did not and does not claim any deduction for revenue derived from the services it

---

[2] *See* SSA Raw Data, Average Wage Index (AWI), *available at* www.ssa.gov/oact/cola/awidevelop.html (last accessed June 3, 2024).

provides to its customers for the *operation* of the network; Visa only claims a deduction for revenue derived from the use of its software.

10. Visa was entitled to the claimed deductions. Software could qualify for the section 199 deduction in three ways. It could qualify under the statute's general rule. And it could qualify under two regulatory exceptions for online software. The VisaNet software qualified under all three. And the Cybersource software qualified under one of the regulatory exceptions.

11. The VisaNet software qualified under the general rule. Under the general rule, taxpayers were allowed a deduction for income "derived" from licensing "any software." Visa's Operating Regulations, which governed Visa's relationships with and among its Issuers and Acquirer customers, included an express license for the VisaNet software. Visa derived revenue from that license in the form of data processing fees that Issuers and Acquirers paid to use VisaNet under that license. Visa claimed the section 199 deduction only for fees that were derived from the use of the licensed software.

12. The VisaNet software also qualified under the online software exceptions. Those exceptions treated income as qualified if **(a)** it was "derived" from providing access to online software; **(b)** the customers used that software directly (*i.e.*, without intervention by the taxpayer); <u>and</u> **(c)** the taxpayer could identify either **(i)** a "self-comparable," meaning comparable software the taxpayer provided to customers in tangible or downloadable form or **(ii)** a "third-party comparable," meaning comparable software a third party provided to its customers in tangible or downloadable form. Even if Visa did not qualify under the general rule for licensing, Visa qualifies for the online software exceptions. Visa derived the fees at issue from providing access to the VisaNet software online, which Issuers and Acquirers used directly (*i.e.*, without intervention by

Visa). The Operating Regulations placed restrictions on the use of the VisaNet software by Visa's customers, their agents, and other entities—the types of restrictions set forth in the Operating Regulations are only necessary when there is unsupervised, direct use of the software. And Visa identified for the IRS at least two self-comparables (*i.e.*, instances where it licensed the VisaNet software to third parties for fees and provided the VisaNet software to those third parties via download or tangible medium). And, not surprisingly, Visa also identified third-party comparables (*i.e.*, examples of third parties providing comparable software for fees via download or tangible medium).

13.     In contrast to the VisaNet software, the Cybersource software did not qualify under the general rule for licensing but, instead, qualified only under one of the exceptions for online software. Visa derived the fees at issue from providing the Cybersource software online. Merchants used the Cybersource software directly (*i.e.*, without intervention by Visa) to accept and process payment card transactions over Visa and other payment networks, such as Mastercard and American Express. And Visa has identified multiple third-party comparables (*i.e.*, examples of third parties providing comparable software for fees via download or tangible medium).

14.     In sum, the VisaNet software qualified under Section 199's general rule for licensing *and* under both regulatory exceptions for online software. And the Cybersource software qualified under one of the regulatory exceptions for online software. What is more, consistent with the statute's purpose, Visa employed hundreds of software engineers in the United States to produce the VisaNet and Cybersource software. And those were good jobs: Visa software engineers made three times the average net compensation of U.S. workers.

## **IDENTITY OF THE PARTIES**

15.     Visa Inc. is a domestic corporation, organized and existing under the laws of the State of Delaware. Visa Inc.'s employer identification number is ████7673. Visa Inc. is the common parent and agent (under Treas. Reg. § 1.1502-77(a)) of the Visa affiliated group of corporations, which files consolidated Forms 1120, U.S. Corporation Income Tax Return.

16.     Members of Visa Inc.'s Expanded Affiliated Group (as defined by section 199(d)(4)(B) and associated regulations) included the following entities:

a.  Visa U.S.A. Inc. is a domestic non-stock corporation, organized and existing under the laws of the State of Delaware. Visa U.S.A. Inc.'s employer identification number is ████1694.

b.  Visa International Service Association is a domestic non-stock corporation, organized and existing under the laws of the State of Delaware. Visa International Service Association's employer identification number is ████8209.

c.  Visa Technology & Operations LLC (f/k/a Inovant LLC) is a limited liability company, organized and existing under the laws of the State of Delaware. Visa Technology & Operations LLC's employer identification number is ████0018.

d.  Interlink Network, Inc. is a domestic corporation, organized and existing under the laws of the State of Delaware. Interlink Network, Inc.'s employer identification number is ████9217.

e.  Plus System, Inc. is a domestic corporation, organized and existing under the laws of the State of Delaware. Plus System, Inc.'s employer identification number is ████0317.

f.  Visa International (Asia-Pacific), LLC is a limited liability company, organized and existing under the laws of Delaware. Visa International (Asia-Pacific), LLC's employer identification number is ███7386.

g.  Cybersource Corporation is a domestic corporation, organized and existing under the laws of the State of Delaware. Cybersource Corporation's employer identification number is ███2961.

h.  Cybersource International, Inc. is a domestic corporation, organized and existing under the laws of the State of Delaware. Cybersource International, Inc.'s employer identification number is ███9420.

i.  Authorize.Net LLC is a limited liability company, organized and existing under the laws of the State of Delaware. Authorize.Net LLC's employer identification number is ███5140.

17.     Defendant is the United States of America.

## JURISDICTION

18.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1491.

19.     Plaintiff fully paid the taxes in issue and filed refund claims within the period specified in 26 U.S.C. § 6511.

20.     Plaintiff filed this complaint within the period specified in 28 U.S.C. §§ 2401 and 2501 and 26 U.S.C. § 6532.

## STATEMENT OF CLAIM

21.     Visa claimed the Section 199 Deduction for revenues derived from software that it produced in whole or in significant part within the United States. Most of the deductions related to the VisaNet software (approximately 96%), which Visa licensed to financial institutions that used it to process data for payment authorization,

8

clearing, and settlement (described in Part II.A below). The remainder related to the Cybersource software (approximately 4%), which Visa provided online to e-commerce merchants that used it to accept and manage payments (described in Part III.A below).

22.     The IRS improperly disallowed the Section 199 Deductions and, as a result, improperly denied Visa's associated refund claims. *See infra* Part IV (detailing refund claims).

## I.     Legal Background

23.     Prior to its repeal in 2017,[3] section 199 provided a deduction for "domestic production activities." The Section 199 Deduction incentivized taxpayers to make things (including software) in the United States. It did so by allowing taxpayers to deduct part of the income they derived from the "lease, rental, license, sale, exchange, or other disposition" of those things. Sec. 199(c)(4)(A)(i)(I); sec. 199(c)(5)(B).

24.     The Section 199 Deduction worked by allowing taxpayers to deduct 9% of the lesser of (i) taxable income or (ii) "qualified production activities income" ("**QPAI**" for short). Sec. 199(a).

25.     QPAI had two components, a gross receipts component and an expense component. Section 199 referred to the gross receipts component as "domestic production gross receipts" ("**DPGR**" for short). *See generally* sec. 199(c)(4)(A); Treas. Reg. § 1.199-3. The expense component was the sum of (i) the cost of goods sold "that are allocable" to the DPGR and (ii) "other expenses, losses, or deductions[], which are properly allocable to" the DPGR. Sec. 199(c)(1)(B). The dispute here focuses on the gross receipts component, DPGR.

---

[3] *See* Pub. L. 115–97, title I, § 13305(a), 131 Stat. 2054, 2126 (Dec. 22, 2017) (repealing section 199).

26.     **General Rule.** DPGR included revenue derived from licensing software produced in whole or in significant part within the United States. Section 199(c)(4)(A)(i)(I) provided that DPGR included "gross receipts . . . derived from . . . any lease, rental, license, sale, exchange, or other disposition" of "qualifying production property" that the taxpayer produced "in whole or in significant part within the United States." *Accord* Treas. Reg. § 1.199-3(a)(1).

27.     Section 199(c)(5)(B), in turn, provided that qualifying production property included "any computer software." *Accord* Treas. Reg. § 1.199-3(i)(6)(i) ("DPGR include the gross receipts of the taxpayer that are derived from the lease, rental, license, sale, exchange, or other disposition of computer software [manufactured, produced, grown or extracted] by the taxpayer in whole or in significant part within the United States."). For section 199 purposes, the term "computer software" was broadly defined, including even the computer program's documentation, along with "any incidental and ancillary rights." Treas. Reg. § 1.199-3(j)(3)(i) ("The term *computer software* means any program or routine or any sequence of machine-readable code that is designed to cause a computer to perform a desired function or set of functions, and the documentation required to describe and maintain that program or routine.") (emphasis in original); Treas. Reg. § 1.199-3(j)(3)(ii) ("Computer software also includes any incidental and ancillary rights that are necessary to effect the acquisition of the title to, the ownership of, or the right to use the computer software, and that are used only in connection with that specific computer software.").

28.     **Services.** The regulations provided that DPGR does not include gross receipts from certain types of services. *See* Treas. Reg. § 1.199-3(i)(6)(ii). Whether something was a "service" was determined under "Federal income tax principles." Treas.

10

Reg. § 1.199-3(i)(1)(i) ("Applicable Federal income tax principles apply to determine whether a transaction is, in substance, a lease, rental, license, sale, exchange, or other disposition, whether it is a service, or whether it is some combination thereof."). Thus, "service" was not determined using, for example, (i) definitions from General Accepted Accounting Principles (GAAP) or (ii) definitions from industry usage, such as the software industry's use of the term "service" to refer to things that software does.

29.    **Exceptions.** When taxpayers provided access to online software without a license, the regulations provided two exceptions that expanded DPGR. The regulations provided that, notwithstanding the services rule in Treas. Reg. § 1.199-3(i)(6)(ii), "if a taxpayer derives gross receipts from providing customers access to computer software . . . for the customers' direct use while connected to the Internet or any other public or private communications network (online software), then such gross receipts will be treated as being derived from the lease, rental, license, sale, exchange, or other disposition of computer software" if either:

   a.  The taxpayer also "derives, on a regular and ongoing basis in [its] business, gross receipts from the lease, rental, license, sale, exchange, or other disposition" of the same software or software with only minor or immaterial differences on a tangible medium or by download (a "**Self-Comparable**"); Treas. Reg. § 1.199-3(i)(6)(iii)(A); or

   b.  Another person "derives, on a regular and ongoing basis in its business, gross receipts from the lease, rental, license, sale, exchange, or other disposition" of "substantially identical software" on a tangible medium or by download (a "**Third-Party Comparable**"). Treas. Reg. § 1.199-3(i)(6)(iii)(B). The regulation defined the phrase "substantially identical software" broadly. Under the

regulation, all that was required for a comparable to be "substantially identical software" was that (i) it has the "same functional result" "[f]rom a customer's perspective" and (ii) it has a "significant overlap" of either "features or purpose." Treas. Reg. § 1.199-3(i)(6)(iv)(A).

30.     As explained below, Visa's revenue from the VisaNet software qualified under the general rule for revenue derived from the license of software. *See infra* Part II.B.i.a. But, regardless of whether it qualified under the general rule, it would also qualify under either the Self-Comparable exception or the Third-Party Comparable exception. *See infra* Parts II.B.i.b and II.B.i.c, respectively. The Cybersource software qualified under the Third-Party Comparable exception. *See infra* Part III.B.i. Visa correctly determined the expenses for each.

## II.     Section 199 Deduction for the VisaNet software

### A. Background

31.     When a cardholder uses a payment card to buy something from a merchant, a payment card network facilitates the transaction. With each transaction, the cardholder and the merchant receive separate but interrelated services. Cardholders are able to make purchases without cash on hand and, in the case of credit cards, to defer payment until later. Merchants obtain quick guaranteed payment and avoid the cost of processing transactions with cash, check, or other payment forms.

32.     Visa, however, ***does not*** provide those services. Visa is not a financial institution. It does not issue cards, extend credit, or set rates and fees for account holders of Visa products. Those services are provided by Issuers and Acquirers: (a) Issuers are third-party financial institutions that issue Visa-branded cards or payment

products to account holders and (b) Acquirers are third-party financial institutions that contract with merchants to accept Visa-branded cards or payment products.

33.     Instead, Visa is one of the world's leaders in digital payments. Visa's customers are not the cardholders or the merchants. Visa's customers are the third-party financial institutions that provide services to those cardholders and merchants (*i.e.*, Issuers and Acquirers).

34.     For Issuers and Acquirers, Visa primarily does two things, only one of which is in issue here: (i) it develops and helps promote the use of the Visa-branded cards and payment products that Issuers and Acquirers offer to their customers (***not in issue***) and (ii) it provides and hosts software that Issuers and Acquirers use to process their data, the VisaNet software (***in issue***).

35.     Visa derived revenue from licensing the VisaNet software to Issuers and Acquirers. Those Issuers and Acquirers used VisaNet to process data with one another for what is referred to as authorizing, clearing, and settling cardholder transactions:

   a.  **Authorization.** Authorization is the process of approving or declining a sales transaction before a purchase is finalized or cash is disbursed. The authorization decision is generally made by Issuers (as the ones that issued the cards being used) or third-party processers acting on their behalf. In addition, Issuers may use the VisaNet software to make authorization decisions based on their own parameters and data.

   b.  **Clearing.** Clearing is the process of collecting and processing the transaction data from the Acquirers and delivering that data to Issuers to be posted on cardholder accounts. Processing this data includes validating transactions,

converting transactions to the appropriate currencies, totaling transactions, sorting transactions by destination, and calculating fees.

c. **Settlement.** Settlement is the daily process of calculating and determining the net financial positions for Issuers and Acquirers and exchanging funds among those Issuers and Acquirers.

### i. Visa

36. Before October 2007, Visa operated as five entities related by ownership and membership: Visa U.S.A.; Visa International (comprising the operating regions of Asia Pacific (AP); Latin America and Caribbean (LAC); and Central and Eastern Europe, Middle East and Africa (CEMEA)); Visa Canada; Visa Europe; and Inovant. The five entities were member associations owned by their respective members—Issuers and Acquirers of Visa-branded cards.

37. In October 2007, Visa undertook a reorganization in which four of the five corporate entities became direct or indirect subsidiaries of Visa Inc. Visa Europe did not become a subsidiary of Visa Inc. and instead remained a membership association owned by its members, the European Issuers and Acquirers. In connection with the reorganization, Visa Europe became a stockholder of Visa Inc. and entered a series of contractual arrangements with Visa Inc. referred to as the "**Framework Agreement**." That agreement included a technology license for the VisaNet software.

38. In March 2008, Visa completed its initial public offering (the "**IPO**"). After the IPO, Visa Europe and the financial institutions that had previously owned Visa held only a minority of the outstanding shareholder interest of Visa Inc. with limited voting rights. Visa Europe (which remained a member association of the European Issuers and Acquirers) and the financial institutions became Visa's customers.

39.     Visa U.S.A., Visa International, and Inovant were members of the Visa Expanded Affiliated Group for all years in issue. Visa Europe was not a member of the Visa Expanded Affiliated Group during the years in issue.[4]

### ii.     VisaNet

40.     Each Issuer or Acquirer either operated a data processing center or designated a third-party data processing center. We begin with the data processing centers and then address the VisaNet software programs.

### a.     Issuer and Acquirer Data Processing Centers

41.     Issuer and Acquirer data processing centers are data processing facilities that house card processing systems (i) that support the acceptance of cards and payment products at merchants and other business locations and (ii) that support the issuance of cards and payment products. These data processing centers may have systems to supply cardholder support services (for Issuers), merchant support services (for Acquirers), or both (for financial institutions that perform both functions).

42.     The Issuer data processing centers' activities included: (i) authorizing transactions, (ii) maintaining cardholder databases, including databases VisaNet uses for stand-in processing ("**STIP**") (described in part II.A.ii.b.1 below), (iii) establishing response procedures, (iv) maintaining specifications for STIP, (v) posting transactions to cardholder accounts, and (vi) managing data for cardholder statements.

43.     The Acquirer data processing centers' activities included: (i) establishing connections and procedures for points of sale (*e.g.*, the electronic terminal at a merchant or an ATM), (ii) providing and maintaining point-of-sale devices,

---

[4] After the years in issue, Visa Inc. acquired Visa Europe.

communications facilities, and merchant operating procedures, (iii) arranging (where applicable) phone service and authorization support for merchant sites, (iv) establishing card processing systems, and (v) establishing point-of-sale procedures through merchant agreements.

44.    The Issuers' and Acquirers' data processing centers used VisaNet through access devices that Visa provided them called VisaNet Access Points (each, a "**VAP**"). Each VAP was standard, commercially available hardware with Visa software that Visa provided to the Issuers and Acquirers. The VAPs were the interface between the Issuers' and Acquirers' data processing centers and Visa's data processing centers, referred to as VisaNet Interchange Centers (each, a "**VIC**"). The VICs housed the IBM mainframes on which much of the VisaNet software ran. Issuers and Acquirers used the VisaNet software loaded on the nearest VIC mainframe unless there was a system disruption, in which case they were automatically shifted to another VIC mainframe to ensure continuity.

### b.    VisaNet Programs

45.    Issuers and Acquirers used the programs in the VisaNet software for authorization, clearing, and settlement: **(1)** they used BASE I for authorization; **(2)** they used BASE II for clearing; **(3)** they used Single Message System (the "**SMS**") as an alternative to BASE I and BASE II for authorization and clearing;[5] and **(4)** they used the VisaNet Settlement Service (the "**VSS**") for settlement. We address each in turn here.

---

[5] Visa sometimes refers to the BASE I and SMS systems collectively as the VisaNet Integrated Payment System (the "**V.I.P. System**").

### 1.    BASE I—Authorization

46.    A transaction begins with a cardholder and a merchant. For example, a transaction might begin when a cardholder inserts a card into a point-of-sale terminal at a merchant. The point-of-sale terminal creates a financial authorization request message and forwards it to the data processing center for the merchant's Acquirer.

47.    Before it could use VisaNet, the Acquirer's data processing center had to log and format the data from the point-of-sale terminal for use with VisaNet. The BASE I system—located in the VIC—supported two formats: (i) BASE I Message Format and (ii) V.I.P. Message Format. Each financial institution designated the format for its data processing centers.[6]

48.    After formatting, the Acquirer's data processing center used the VAP to transmit the formatted data to BASE I as an authorization request message. The Acquirer used BASE I to, among other things, validate the transaction and perform requested currency conversion. Then, based on information set up by the Issuer, BASE I routed the request either to the Issuer's data processing center or to VisaNet's stand-in processing (*see* paragraphs 50–53 below). If the Issuer had designated a different format for its data processing center than the Acquirer's data processing center (*e.g.*, if the Issuer uses BASE I Message Format and the Acquirer uses V.I.P. Message Format), the BASE I system made any necessary adjustments before delivering the requests.

49.    **Issuer Authorization.** The Issuer's data processing center checked the transaction against the account status (*e.g.*, checking against the account balance, activity limits, and other controls) and made an authorization decision. The Issuer's

---

[6] The SMS (discussed below) uses only the V.I.P. Message Format.

data processing center then created an authorization or financial response message and sent it to the BASE I system, which processed and logged the response before forwarding it to the Acquirer's data processing center.

50. **Stand-In Processing.** Issuers also used BASE I to authorize transactions, decline transactions, or refer authorization decisions to the Issuer (when the Issuer was available) in a process called "stand-in processing." Issuers provided and maintained the parameters and data used for STIP.

51. Issuers used STIP differently depending on whether their data processing centers were available or unavailable. When an Issuer's data processing center was available, it could use STIP as backup for transaction volumes in excess of the Issuer's capacity or to reduce expenses by having STIP approve low-risk, small amount transactions. When an Issuer's data processing center was unavailable, it could use STIP as a backup to ensure uninterrupted cardholder service.

52. Once the authorization was complete—be it from the Issuer or through STIP—BASE I processed the data, carrying out checks and coding the data with information about how it was authorized (*e.g.*, by the Issuer or stand-in processing). BASE I then transmitted the processed response to the Acquirer's data processing center, which, in turn, sent a message to the merchant telling it whether the transaction was authorized or declined.

53. Finally, Issuers and Acquirers used BASE I for other tasks, including (i) managing the system tables used for processing transaction data (Issuers are responsible for updating the cardholder database files used for STIP) and (ii) producing a variety of reports, such as authorization profile reports, cardholder database reports, custom payment service reports, and Visa Point of Sale (POS) reports.

## 2.   BASE II—Clearing

54.   BASE II was a batch transaction clearing system that Issuers and Acquirers used for processing interchange data. Issuers and Acquirers used BASE II through the Edit Package, which is a part of the VisaNet software that Issuers and Acquirers install on their own hardware housed in their own data processing centers. Visa updated the Edit Package biannually and provided it to Issuers and Acquirers via download. Visa provided versions of the Edit Package for either Windows PCs or IBM mainframes, and the data processing center could elect which version to download onto their hardware.

55.   The data processing centers used the Edit Package for two types of processing: (i) preparing the data processing centers' outgoing data for transmission to the VIC and (ii) receiving and reporting on incoming data from the VIC.

56.   **Outgoing Processing.** The data processing centers began outgoing processing with "pre-edit processing," which they performed with their own software. Through this process, the data processing centers captured, edited, and formatted their data for transmission to BASE II via the Edit Package and VAP.

57.   Once the pre-edit was complete, data processing centers used the Edit Package to prepare reports and produce an interchange data file. The data processing center then transferred the interchange data to the VAP, which transmitted it to the BASE II system at a predetermined time. The BASE II software (i) validated the transactions, (ii) converted transactions to the appropriate currencies, (iii) totaled transactions, (iv) sorted transactions by destination, (v) distributed transaction data by destination, and (vi) calculated fees.

58.   **Incoming Processing.** The data processing centers began incoming processing when they received an interchange file from the VIC. Data processing centers again used the Edit Package to generate reports and format the data to the file types used by the data processing centers (unless there were severe errors in the interchange file requiring additional intervention by Issuer or Acquirer employees).

### 3.   SMS—Authorization & Clearing Alternative

59.   Some Issuers and Acquirers used the single-message system ("**SMS**") as an alternative to BASE I and BASE II. Issuers and Acquirers used the SMS for the same authorization and clearing functions as BASE I and BASE II. But, rather than making separate data transmissions for authorization and clearing, when using the SMS, the data processing centers made only a single data transmission (*i.e.*, a single message) with all the data for authorization and clearing.

60.   While only the SMS performed this type of single-message processing, the SMS also supported, among other things, dual processing, communicating with BASE I, and delivering transactions to BASE II for data processing centers using those systems. In addition, the SMS included STIP functions that Issuers could use when their systems were unavailable due to hardware, software, or communications failure or when transaction volumes exceeded their data processing centers' capacity.

### 4.   VSS—Settlement

61.   Regardless of whether they processed their clearing data with the SMS or BASE II, Issuers and Acquirers used the VSS software for calculating and determining their net financial positions for all transactions they cleared using the SMS or BASE II.

62.   Issuers and Acquirers determined how the VSS system processed their data. The VSS software allowed Issuers and Acquirers to define up to eight levels of

settlement relationships, which allowed them to settle their transactions at an entity level or by individual products they offered, depending on their business needs. Similarly, the VSS software allowed Issuers and Acquirers to define the funds transfer points and the various cut-off times for their own business needs.

63.     In addition to processing their data for settlement, Issuers and Acquirers used VSS to create a variety of reports. Issuers and Acquirers could choose between a number of standardized report layouts or could create customized reports.

### c.     Visa provided the VisaNet software to Issuers and Acquirers in different ways

64.     Visa provided the VisaNet software to the financial institutions for their use in different ways: (i) online, (ii) via download, and (iii) on tangible medium.

65.     **Online.** Issuers and Acquirers generally used BASE I, BASE II, SMS, and VSS software on Visa's servers at the VICs, accessing the software through the VAPs in their data processing centers. *Cf*. Part II.B.i.b.3 (describing Visa's providing the VisaNet software on tangible medium and via download); and Part II.B.i.b.4 (describing Visa's providing the VisaNet software on tangible medium).

66.     **Download.** Visa delivered parts of the VisaNet software, including the Edit Package software (*see* Part II.A.ii.b.2, above), via download. Visa updated the software semiannually. And the data processing centers downloaded the software onto their computers.

67.     **Tangible medium.** Visa provided parts of the VisaNet software on tangible medium. For example, the VAPs were standard, commercial hardware loaded with Visa software. In addition, Visa Europe (unrelated to Visa during the years in issue) had a copy of VisaNet on its own servers. *See infra* Part II.B.i.b.3. And one third-party

financial institution had its own copy of VisaNet hosted on servers in a VIC. *See infra* Part II.B.i.b.4.

68.    Visa also provided specifications and user guides for Issuer and Acquirer data processing center personnel to instruct them in how to use the VisaNet software.

### B.    Visa is entitled to the claimed Section 199 Deduction for the VisaNet software

69.    VisaNet revenue is DPGR under the general rule, the Self-Comparable exception, and the Third-Party Comparable exception. Visa produced the VisaNet software in whole or in significant part within the United States. And Visa correctly determined the expenses properly allocable to the VisaNet revenue.

### i.    VisaNet Revenue is DPGR

### a.    General Rule

70.    DPGR included "gross receipts . . . derived from . . . ***any*** . . . license . . . " of "qualifying production property" produced "in whole or in significant part within the United States." Sec. 199(c)(4)(A)(i)(I) (emphasis added); Treas. Reg. § 1.199-3(a)(1). And qualifying production property included "***any*** computer software." Sec. 199(c)(5)(B) (emphasis added); Treas. Reg. § 1.199-3(j)(1)(ii). Visa derived the revenue at issue from the license of computer software, VisaNet, to its customers, the Issuers and Acquirers.

### 1.    Visa licensed the VisaNet software to Issuers and Acquirers

71.    The Visa Operating Regulations represented a binding contract between Visa and the participants in the Visa system. The Visa Operating Regulations governed the relationships between Visa and the Issuers and Acquirers. Chapter 3 of the

Operating Regulations was the "**Visa License**." The Visa License granted Issuers and Acquirers permission to use the "licensed technology" (which included VisaNet) in order for those Issuers and Acquirers "to provide payment and other financial services" to their customers—cardholders or merchants, respectively.

**Figure 1. Excerpt—V**ISA **O**PERATING **R**EGULATIONS**, 95 (Oct. 2010)**



72.     The Visa License included a Software License, which separately specified that the right to use VisaNet granted under the VisaNet license was a non-assignable right to use.

**Figure 2.  Excerpt—Visa Operating Regulations, 108 (Oct. 2010)**

## Software License

\*          \*          \*

**Non-Transferability**

**Non-Assignable Right to Use VisaNet**

A Member's right to use VisaNet is **not** assignable and its duties are non-delegable without prior written consent from Visa. However, a Member may use a non-Member VisaNet Processor that has executed and delivered to Visa a "VisaNet Letter of Agreement" (Exhibit 5A).

73.     Effective October 15, 2014, the "Visa Rules" replaced the Operating Regulations. The Visa Rules continued to provide licenses for BASE I, BASE II, the SMS, the VSS software, and the VAP software.

### 2.     Visa derived the revenue at issue from licensing the VisaNet software

74.     Visa's operating revenues were principally comprised of (i) service revenues (***not in issue***), (ii) data processing revenues (***in issue***), and (iii) international transaction revenues (***in issue***). In addition, Visa reported an "other revenues" category (***in issue***) in its financial statements. Of those, Visa derived part of the data processing revenues, part of the international transaction revenues, and part of "other revenues" from the license of the VisaNet software.

75.     **Data Processing Revenue.** Visa derived part of its data processing revenue from licensing the VisaNet software. Specifically, Visa claimed the Section 199 Deduction for the following data processing revenues derived from the license of the VisaNet software:

a.  Revenue from charges for Issuers' and Acquirers' use of Visa's BASE I software to process authorization request data;

b.  Revenue from charges for Issuers' and Acquirers' use of Visa's BASE II and VSS software to process clearing and settlement data;

c.  Revenue from charges for Issuers' and Acquirers' use of Visa's SMS and VSS software to process authorization, clearing, and settlement data;

d.  Revenue from charges for the Visa Advanced Authorization software functions; and

e.  Revenue from charges for the use and operation of VisaNet software based on the number of transactions for which Issuers and Acquirers used BASE I, BASE II, SMS, and VSS.

76.    **International Transaction Revenue**. Visa derived part of its international transaction revenue from the license of the VisaNet software. Specifically, Visa claimed the Section 199 Deduction for revenue from charges for Issuers' and Acquirers' use of VisaNet's functions for processing international transactions.

77.    **Other Revenue.** Visa derived part of its other revenue from the license of the VisaNet software. Specifically, Visa claimed the Section 199 Deduction for charges for the technology license in the Framework Agreement.

78.    Because Visa derived the categories of revenue described in paragraphs 68 and 70 above from licensing the VisaNet software, those categories of revenue qualify as DPGR under the general rule.

### b.    Self-Comparable Exception

79.    Even if there were no VisaNet license and thus the revenue categories described in Part II.B.i.a.2 above were not derived from the license of software, those

same revenue categories would qualify as DPGR under the Self-Comparable exception: (i) VisaNet included online software, (ii) Visa derived revenue on a regular and ongoing basis from licensing VisaNet to Visa Europe (then an independent member association made up of more than 4,000 European Issuers and Acquirers) and providing the software to Visa Europe on tangible medium and by download, and (iii) Visa derived revenue on a regular and ongoing basis from licensing VisaNet separately to one of the Issuers and providing the software on a tangible medium.

80.     The regulations provided that, "if a taxpayer derives gross receipts from providing customers access to computer software . . . for the customers' direct use while connected to the Internet or any other public or private communications network (online software)," then "such gross receipts will be treated as being derived from the lease, rental, license, sale, exchange, or other disposition of computer software" if the taxpayer meets the Self-Comparable exception. Treas. Reg. § 1.199-3(i)(6)(iii).

81.     A taxpayer meets the Self-Comparable exception if "[t]he taxpayer also derives, on a regular and ongoing basis in the taxpayer's business, gross receipts from the lease, rental, license, sale, exchange, or other disposition to customers that are not related persons (as defined in [Treas. Reg. § 1.199-3(b)(1)]) of computer software that— (1) Has only minor or immaterial differences from the online software; (2) Has been [made or produced] by the taxpayer in whole or in significant part within the United States; and (3) Has been provided to such customers either affixed to a tangible medium (for example, a disk or DVD) or by allowing them to download the computer software from the Internet . . . ." Treas. Reg. § 1.199-3(i)(6)(iii)(A).

### 1. Much of the VisaNet software was online software

82.     The BASE I, BASE II (other than Edit Package), SMS, and VSS software generally ran on Visa servers located in the VICs. Issuers and Acquirers used that software through a private communications network: they accessed VisaNet through the VAPs located in their data processing centers, and the VAPs were connected to the servers in the VICs by leased telecommunications lines.

### 2. Visa derived gross receipts on a regular and ongoing basis from providing Issuers and Acquirers access to VisaNet for their direct use

83.     Visa derived gross receipts from providing Issuers and Acquirers access to VisaNet for their direct use while connected to a private communications network (through the VAPs). The revenues described in Part II.B.i.a.2 above are derived from Issuers' and Acquirers' direct use of that software: (i) Issuers and Acquirers input their own data and provide it directly to VisaNet without modification by, or intervention of, Visa employees and (ii) Issuers and Acquirers received the output of the VisaNet software without modification by, or intervention of, Visa employees. And Issuers and Acquirers were the only ones that could use the software for their businesses: the software performed tasks for Issuers and Acquirers; Visa was neither.

84.     Visa derived those gross receipts on a regular and ongoing basis. Visa regularly invoiced Issuers and Acquirers for those gross receipts based on the fees set forth in detailed schedules. Visa recorded those gross receipts on its books by reference to the use of the VisaNet software, the software functions provided to the user, or both.

### 3. Visa satisfies the Self-Comparable exception through its license of VisaNet to Visa Europe

85.     During the years in issue, Visa Europe was an unrelated third party, a member association owned and governed by its members, thousands of European Issuers and Acquirers.[7]

86.     In connection with an October 2007 reorganization, Visa and Visa Europe entered the Framework Agreement regarding, among other things, the granting of certain licenses between Visa and Visa Europe. The Framework Agreement included three primary agreements: (i) Schedule 1—Bilateral Services Agreement (*not in issue*), (ii) Schedule 2—Technology License Agreement (*in issue*), and (iii) Schedule 3—Trademark License Agreement (*not in issue*).

87.     The Technology License Agreement granted Visa Europe rights in, among other things, "all Intellectual Property owned by [Visa] . . . and used in respect of the Visa Products and Services or relating to the management, operation, maintenance or promotion of, or participation in, the Visa System . . . ." The term "Visa System" meant "the information technology and other systems and platforms for global data processing and payment authorization, clearing and settlement, including VisaNet . . . ." The term "Visa System" thus included the VisaNet software used by Issuers and Acquirers during the years in issue.

---

[7] After the years in issue, on June 21, 2016, Visa Inc. acquired Visa Europe. Visa Inc., Form 8-K, Current Report, Item 2.01 (June 21, 2016).

88.    Visa derived gross receipts from the Technology License Agreement on a regular and ongoing basis: the Framework Agreement required Visa Europe to pay license fees to Visa on a quarterly basis.

89.    Visa produced the software it provided to Visa Europe in whole or in significant part within the United States. That software had no material differences from the VisaNet software that Visa provided online to Issuers and Acquirers. Visa provided the VisaNet software to Visa Europe on tangible medium and by allowing Visa Europe to download the software to its servers.

### 4.    Visa satisfies the Self-Comparable exception through its license of the LicenseNet Platform

90.    In 2013, Visa and one of its financial institution customers entered a License & Services Agreement regarding, among other things, "licensing from Visa and use of the LicenseNet Platform, which [was] a mirrored instance of the VisaNet Platform" (the "**LicenseNet License**"). The terms "VisaNet Platform" and "VisaNet" meant "the components of Visa's payment card transaction processing platform."

91.    Visa derived gross receipts from the LicenseNet License on a regular and ongoing basis. Section 14 of the LicenseNet License required the third-party financial institution to pay Visa a Payment System Integrity Fee and other fees based on the volume processed on LicenseNet. The LicenseNet License required it to pay those fees on a monthly basis.

92.    Visa produced the LicenseNet software in whole or in significant part within the United States. The LicenseNet software had no material differences from the VisaNet software that Visa provided online to other Issuers and Acquirers. Visa

provided the LicenseNet software on tangible medium and by allowing the licensee to download the software.

### c.     Third-Party Comparable Exception

93.     Even if there were no VisaNet license and thus the revenue categories described in Part II.B.i.a.2 above were not derived from the license of software and did not qualify under the Self-Comparable exception, those same revenue categories would qualify as DPGR under the Third-Party Comparable exception: (i) VisaNet included online software, (ii) Visa derived gross receipts on a regular and ongoing basis from providing Issuers and Acquirers access to VisaNet for their direct use, and (iii) there were a number of other entities that derived gross receipts from the lease, rental, license, sale, exchange, or other disposition of software that was "substantially identical" to various VisaNet programs.

94.     The regulations provided that, "if a taxpayer derives gross receipts from providing customers access to computer software . . . for the customers' direct use while connected to the Internet or any other public or private communications network (online software)," then "such gross receipts will be treated as being derived from the lease, rental, license, sale, exchange, or other disposition of computer software" if the taxpayer meets the Third-Party Comparable exception. Treas. Reg. § 1.199-3(i)(6)(iii).

95.     The Third-Party Comparable exception applied if "[a]nother person derives, on a regular and ongoing basis in its business, gross receipts from the lease, rental, license, sale, exchange, or other disposition of substantially identical software (as described in [Treas. Reg. § 1.199-3(i)(6)(iv)(A)]) (as compared to the taxpayer's online software) to its customers pursuant to an activity described in [Treas. Reg. § 1.199-3(i)(6)(iii)(A)(3)]." Treas. Reg. § 1.199-3(i)(6)(iii)(B).

a. The term "substantially identical software" meant software that, "(1) [f]rom a customer's perspective, has the same functional result as the online software [at issue]; and (2) [h]as a significant overlap of features *or* purpose with the online software [at issue]." Treas. Reg. § 1.199-3(i)(6)(iv)(A) (emphasis added).

b. The activity described in Treas. Reg. § 1.199-3(i)(6)(iii)(A)(3) was providing the software "to such customers either affixed to a tangible medium (for example, a disk or DVD) or by allowing them to download the computer software from the Internet."

96.     As explained in Part II.B.i.b.1 above, much of the VisaNet software was online software, and Issuers and Acquires directly used the VisaNet software.

97.     There were a number of other entities that derived gross receipts from the lease, rental, license, sale, exchange, or other disposition of software that was "substantially identical" to various VisaNet programs and that was either affixed to a tangible medium or available by download. Visa provided evidence for numerous comparables during the administrative proceedings (the "**VisaNet Third-Party Comparables**"). The VisaNet Third-Party Comparables included software comparable to various aspects of the VisaNet software's authorization, clearing, settlement, and multi-currency functions. For example, a competing card network operator provided authorization software to its issuers and acquirers on a tangible medium (loaded on hardware referred to as an interface processor). And Visa identified that software as one of its third-party comparables.

### d. Visa produced the VisaNet software in whole or in significant part within the United States

98.     The VisaNet software was produced in whole or in significant part within the United States. VisaNet was initially developed in the United States and has been continuously improved, refined, and expanded in the United States. During the years in issue, Visa employed a substantial workforce in the United States that was engaged in those activities, with hundreds of employees focused on software engineering and development.

### ii. Visa determined the expenses properly allocable to the DPGR for VisaNet

99.     To determine the expenses, losses, and deductions properly allocable to DPGR, Visa first eliminated expenses, losses, and deductions resulting from intercompany transactions. Next, it assigned expenses, losses, and other deductions that were directly associated with DPGR or non-DPGR revenues as allocable to DPGR or not allocable to DPGR, respectively. Finally, Visa allocated a portion of the remaining expenses, losses, and other deductions to DPGR based on a review of those items.

## III.   Section 199 Deduction for the Cybersource Software

100.     Visa acquired Cybersource on July 21, 2010. Cybersource Corporation and its subsidiaries provided electronic payment, risk management, and payment security software to online merchants. Its products included enterprise software called Cybersource and small business software called Authorize.net (collectively, the "**Cybersource Software**"). Both were provided as online software.

101.     E-commerce merchants used these programs to accept electronic payments securely and to connect with payment processing networks. Revenues derived

from the Cybersource Software qualified under the Third-Party Comparable rule of Treas. Reg. § 1.199-3(i)(6)(iii)(B).

### A. Background

102.    Merchants used the Cybersource Software to accept electronic payments and to connect with acquirers for various payment networks (including Acquirers for the Visa network). Cybersource and Authorize.net provided similar functions but differed as to the size of businesses for which they were designed: Cybersource was designed for larger businesses and Authorize.net was designed for small to medium-sized businesses.

103.    There are three categories of Cybersource Software: (i) payment processing software, (ii) payment security software, and (iii) fraud management software.

### i.    Payment Processing Software

104.    Merchants used the payment processing software to accept card and alternative payments through various sales channels, such as mobile, web, point-of-sale, and call centers, with a single connection. Merchants also used it to automate recurring and subscription transactions and to configure payment schedules and customer communications.

105.    Merchants used the software through "OneAPI," which was a standardized "application program interface." OneAPI enabled the merchants to process transactions for a variety of payment channels and to connect to the processor or Acquirer of their choice. Merchants also used the payment processing software to develop and create standardized or customized analytical reports based on their needs.

### ii.   Payment Security Software

106.   Merchants used the Cybersource payment security software to reduce the risks of dealing with customers' payment data. Cybersource payment security software reduced risks by having payment data pass directly from customers to secure Cybersource servers. This allowed merchants to accept payments without the risks of keeping payment data on their servers.

### iii.   Fraud Management Software

107.   The Cybersource fraud management software allowed merchants to accept more payments while minimizing the risk of fraudulent payments.

108.   Merchants used a program called Decision Manager to evaluate incoming orders based on anti-fraud rules set by the merchants to meet their individual needs. Decision Manager made real-time decisions using hundreds of data elements in every risk assessment, based on data derived from transactions processed in VisaNet and Cybersource Software.

109.   Merchants used a program called Decision Manager Replay to compare various "what-if" fraud strategies against their historical data to quantify the effect of changes they might make to the anti-fraud rules they set for Decision Manager. Merchants used a program called Fraud Alert to receive timely notifications of fraudulent transactions, allowing them to act before damage was done.

**B. Visa is entitled to the claimed Section 199 Deductions for the Cybersource Software.**

  **i.**  **Cybersource Software revenue is DPGR**

   **a.**  **Third-Party Comparable Exception**

110. The Cybersource Software revenue was DPGR under the Third-Party Comparable exception: (i) Cybersource was online software, (ii) Visa derived gross receipts on a regular and ongoing basis from providing merchants access to the Cybersource Software for their direct use, and (iii) there were a number of other entities that derived gross receipts from the lease, rental, license, sale, exchange, or other disposition of software that was "substantially identical" to various aspects of Cybersource programs.

111. The Cybersource Software was online software. Cybersource's secure servers hosted the Cybersource Software and the merchants directly used the Cybersource Software while connected to the internet.

112. Visa derived gross receipts on a regular basis from providing the merchants access to the Cybersource Software while connected to the internet. The merchants directly used the Cybersource Software. In the ordinary course, no Cybersource employees were involved in the merchants' use of the Cybersource Software. And Cybersource offered only software; its employees developed and maintained software for e-commerce, and the merchants used the software for those e-commerce sales.

113. There were a number of other entities that derived gross receipts from the lease, rental, license, sale, exchange, or other disposition of software that was "substantially identical" to various Cybersource programs, and that software was either

affixed to a tangible medium or available for download. Visa provided evidence for numerous comparables during the administrative proceedings (the "**Cybersource Third-Party Comparables**").

114. The Cybersource Third-Party Comparables had the same functional result as various aspects of the Cybersource Software from a customer's perspective and had significant overlap of features, purpose, or both. The Cybersource Third-Party Comparables included software comparables for (a) Cybersource and (b) Authorize.net. For each, the Cybersource Third-Party Comparables included software comparables for payment processing, payment security, and fraud management.

### b. Cybersource produced the Cybersource Software in whole or in significant part within the United States.

115. The Cybersource Software was produced in whole or in significant part within the United States. The Cybersource Software was initially developed in the United States and, since Visa's 2010 acquisition of Cybersource, Cybersource continued to employ a substantial workforce in the United States for the development of the Cybersource Software.

### ii. Visa determined the expenses properly allocable to the DPGR for the Cybersource Software

116. As explained in part II.B.ii above, to determine the expenses, losses, and deductions properly allocable to DPGR, Visa first eliminated expenses, losses, and deductions resulting from intercompany transactions. Next, it assigned expenses, losses, and other deductions that were directly associated with DPGR or non-DPGR revenues as allocable to DPGR or not allocable to DPGR, respectively. Finally, Visa allocated a

portion of the remaining expenses, losses, and other deductions to DPGR based on a review of those items.

**IV.      Refund Claims**

    **A. Refund Claim Summary**

117.     Visa filed timely refund claims related to the Section 199 Deductions in issue for its tax years ending September 30, 2008, September 30, 2009, September 30, 2010, September 30, 2011, September 30, 2012, September 30, 2013, September 30, 2014, and September 30, 2015.

118.     As explained in part IV.B below, some of the refund claims included items other than the Section 199 Deductions. The IRS allowed refunds unrelated to the Section 199 Deductions but improperly denied the refund claims attributed to the Section 199 Deductions. For Visa's Refund Claims, the following table summarizes the amounts of the Section 199 Deductions and the amounts of the associated refund claims improperly denied for each tax year.

| Tax Year Ending | Section 199 Deduction | Associated Refund Claim |
|---|---|---|
| Sept. 30, 2008 | $74,616,915 | $26,115,920 |
| Sept. 30, 2009 | 103,064,520 | 36,072,582 |
| Sept. 30, 2010 | 115,886,221 | 40,560,177 |
| Sept. 30, 2011 | 198,811,315 | 69,583,960 |
| Sept. 30, 2012 | 227,085,098 | 79,479,784 |
| Sept. 30, 2013 | 116,205,373 | 36,931,948 |
| Sept. 30, 2014 | 328,363,269 | 110,109,919 |
| Sept. 30, 2015 | 320,473,067 | 120,722,731 |
| | **$1,484,505,778** | **$519,577,021** |

## B.  Refund Claim Details

### i.      Tax Year ended September 30, 2008

119.    Visa timely filed Form 1120, U.S. Corporation Income Tax Return, for its tax year ended September 30, 2008 on June 12, 2009 (the "**Original 2008 Return**") with the IRS Service Center in Ogden, UT. The Original 2008 Return did not claim the Section 199 Deduction.

120.    The Original 2008 Return reported total tax of $551,098,698. Visa timely paid this tax by making electronic payments and applying credits as follows:

| Payment Type | Date | Amount |
|---|---|---|
| Estimated Tax | Mar. 17, 2008 | $90,000,000 |
| Estimated Tax | Mar. 17, 2008 | 21,000,000 |
| Estimated Tax | June 16, 2008 | 88,000,000 |
| Estimated Tax | June 16, 2008 | 84,000,000 |
| Estimated Tax | June 16, 2008 | 80,000,000 |
| Estimated Tax | Sept. 15, 2008 | 95,000,000 |
| Estimated Tax | Jan. 15, 2008 | 17,000,000 |
| Estimated Tax | Jan. 15, 2008 | 90,000,000 |
| Prior Year Credit | Jan. 15, 2008 | 45,621,029 |
| Prior Year Credit | Jan. 15, 2008 | 1,729,658 |
| Prior Year Credit | Jan. 15, 2008 | 4,115 |
| Prior Year Credit | Jan. 15, 2008 | 6,333 |
| Payment | Sept. 15, 2009 | 162 |

121.    On March 17, 2014, Visa timely filed a refund claim for its tax year ended September 30, 2008 on Form 1120X, Amended U.S. Corporation Income Tax Return (the "**2008 Refund Claim**"), with the IRS Service Center in Ogden, UT. The 2008 Refund Claim (i) included a claim for a $74,616,915 Section 199 Deduction and (ii) sought a total refund of $66,996,305.

122.    On February 22, 2018, Visa timely filed an amendment to the 2008 Refund Claim with the IRS Service Center in Ogden, UT. The amendment provided additional explanation of the grounds for the refund claim.

123.    Following an examination and administrative appeals process, on August 16, 2022, Visa timely filed an amendment to the 2008 Refund Claim with the IRS Service Center in Ogden, UT. The amendment confirmed that the positions taken by Visa during the examination and administrative appeal process were incorporated as grounds for the refund claim.

124.    On October 12, 2022, the IRS sent Visa Letter 1363, Appeals Partial Disallowance of Refund Claim—Certified Letter, denying the portion of the 2008 Refund Claim, as amended, related to the Section 199 Deduction (the "**2008 Partial Denial Letter**"). The 2008 Partial Denial Letter explained the partial denial as follows:

> It is determined that you are not allowed the $74,616,915 domestic production activities deduction raised in your claim for the tax year ended September 30, 2008 because you have not established that you meet the requirements for the deduction under Section 199 of the Internal Revenue Code.

The 2008 Partial Denial Letter (i) allowed a refund of $41,648,479 unrelated to the Section 199 Deduction and (ii) denied the part of the refund claim related to the Section 199 Deduction.

125.    For its tax year ended September 30, 2008 (i) Visa was entitled to a Section 199 Deduction of $74,616,915 (or such other amount as properly determined by law) and (ii) Visa is entitled to an additional refund of $26,115,920 (or such other amount as properly determined by law) attributable to that deduction.

### ii.    Tax Year ended September 30, 2009

126.    Visa timely filed Form 1120, U.S. Corporation Income Tax Return, for its tax year ended September 30, 2009 on June 11, 2010 (the "**Original 2009 Return**") with the IRS Service Center in Ogden, UT. The Original 2009 Return did not claim the Section 199 Deduction.

127.    The Original 2009 Return reported total tax of $723,355,742. Visa timely paid this tax by making electronic payments and applying credits as follows:

| Payment Type | Date | Amount |
| --- | --- | --- |
| Estimated Tax | Jan. 15, 2009 | $90,000,000 |
| Estimated Tax | Jan. 15, 2009 | 50,000,000 |
| Prior Year Credit | Jan. 15, 2009 | 61,093,877 |
| Prior Year Credit | Jan. 15, 2009 | 10,448 |
| Estimated Tax | Mar. 16, 2009 | 66,000,000 |
| Estimated Tax | June 15, 2009 | 90,000,000 |
| Estimated Tax | June 15, 2009 | 50,000,000 |
| Estimated Tax | Sept. 15, 2009 | 90,000,000 |
| Estimated Tax | Sept. 15, 2009 | 90,000,000 |
| Estimated Tax | Sept. 15, 2009 | 90,000,000 |
| Estimated Tax | Sept. 15, 2009 | 90,000,000 |
| Estimated Tax | Sept. 15, 2009 | 30,000,000 |

128.    On May 21, 2015, Visa timely filed a refund claim for its tax year ended

September 30, 2009 on Form 1120X, Amended U.S. Corporation Income Tax Return

(the "**2009 Refund Claim**"), with the IRS Service Center in Ogden, UT. The 2009

Refund Claim (i) included a claim for a $103,064,520 Section 199 Deduction and

(ii) sought a total refund of $30,661,714. The Section 199 Deduction alone would have

resulted in a $36,072,582 refund, but the 2009 Refund Claim included other

adjustments. Those adjustments reduced the refund by $5,410,868 to $30,661,714.

Following examination, Visa and the IRS agreed that those other adjustments actually

resulted in Visa's owing a $648,140 balance without the Section 199 Deduction. Visa

satisfied that balance by transferring an overpayment balance from a different tax year.

129.    On February 22, 2018, Visa timely filed an amendment to the 2009

Refund Claim with the IRS Service Center in Ogden, UT. The amendment provided

additional explanation of the grounds for the refund claim.

130.    Following an examination and administrative appeals process, on August

16, 2022, Visa timely filed an amendment to the 2009 Refund Claim with the IRS

Service Center in Ogden, UT. The amendment confirmed that the positions taken by

Visa during the examination and administrative appeal process were incorporated as

grounds for the refund claim.

131.    On October 12, 2022, the IRS sent Visa Letter 1364, Appeals Full

Disallowance of Refund Claim—Certified Letter, denying the 2009 Refund Claim, as

amended, regarding the Section 199 Deduction (the "**2009 Denial Letter**"). The letter

explained the denial as follows:

> It is determined that you are not allowed the $103,064,520
> domestic production activities deduction raised in your claim for

the tax year ended September 30, 2009 because you have not
established that you meet the requirements for the deduction under
Section 199 of the Internal Revenue Code.

132.    For its tax year ended September 30, 2009, (i) Visa was entitled to a
Section 199 Deduction of $103,064,520 (or such other amount as properly determined
by law) and (ii) Visa is entitled to a refund of $36,072,582 (or such other amount as
properly determined by law) attributable to that deduction.

### iii.    Tax Year ended September 30, 2010

133.    Visa timely filed Form 1120, U.S. Corporation Income Tax Return, for its
tax year ended September 30, 2010 on June 14, 2011 (the "**Original 2010 Return**")
with the IRS Service Center in Ogden, UT. The Original 2010 Return did not claim the
Section 199 Deduction.

134.    The Original 2010 Return reported total tax of $949,829,856. Visa timely
paid this tax by making electronic payments and applying credits as follows:

| Payment Type | Date | Amount |
|---|---|---|
| Estimated Tax | Jan. 15, 2010 | $50,000,000 |
| Estimated Tax | Jan. 15, 2010 | 90,000,000 |
| Estimated Tax | Mar. 15, 2010 | 90,000,000 |
| Estimated Tax | Mar. 15, 2010 | 66,000,000 |
| Estimated Tax | Mar. 15, 2010 | 90,000,000 |
| Estimated Tax | Mar. 15, 2010 | 90,000,000 |
| Estimated Tax | Mar. 15, 2010 | 90,000,000 |
| Estimated Tax | June 15, 2010 | 59,200,000 |
| Estimated Tax | June 15, 2010 | 99,900,000 |
| Prior Year Credit | Jan. 15, 2010 | 73,748,583 |
| Estimated Tax | Sept. 15, 2010 | 90,000,000 |
| Estimated Tax | Sept. 15, 2010 | 95,000,000 |
| Estimated Tax | Sept. 15, 2010 | 75,000,000 |

135.    On May 21, 2015, Visa timely filed a refund claim for its tax year ended September 30, 2010 on Form 1120X, Amended U.S. Corporation Income Tax Return (the "**2010 Refund Claim**"), with the IRS Service Center in Ogden, UT. The 2010 Refund Claim (i) included a claim for a $115,886,221 Section 199 Deduction and (ii) sought a total refund of $91,718,664.

136.    On February 22, 2018, Visa timely filed an amendment to the 2010 Refund Claim with the IRS Service Center in Ogden, UT. The amendment provided additional explanation of the grounds for the refund claim.

137.    Following an examination and administrative appeals process, on August 16, 2022, Visa timely filed an amendment to the 2010 Refund Claim with the IRS Service Center in Ogden, UT. The amendment confirmed that the positions taken by Visa during the examination and administrative appeal process were incorporated as grounds for the refund claim.

138.    On October 12, 2022, the IRS sent Visa Letter 1363, Appeals Partial Disallowance of Refund Claim—Certified Letter, denying the portion of the 2010 Refund Claim, as amended, related to the Section 199 Deduction (the "**2010 Partial Denial Letter**"). The 2010 Partial Denial Letter explained the denial as follows:

> It is determined that you are not allowed the $115,886,221 domestic production activities deduction raised in your claim for the tax year ended September 30, 2010 because you have not established that you meet the requirements for the deduction under Section 199 of the Internal Revenue Code.

The 2010 Partial Denial Letter (i) allowed a refund of $54,118,316 unrelated to the Section 199 Deduction and (ii) denied the part of the refund claim related to the Section 199 Deduction.

139.    For its tax year ended September 30, 2010 (i) Visa was entitled to a Section 199 Deduction of $115,886,221 (or such other amount as properly determined by law) and (ii) Visa is entitled to a refund of $40,560,177 (or such other amount as properly determined by law) attributable to that deduction.

### iv.    Tax Year ended September 30, 2011

140.    Visa timely filed Form 1120, U.S. Corporation Income Tax Return, for its tax year ended September 30, 2011 on June 13, 2012 (the "**Original 2011 Return**")

with the IRS Service Center in Ogden, UT. The Original 2011 Return did not claim the Section 199 Deduction.

141.    The Original 2011 Return reported total tax of $1,325,057,990. Visa timely paid this tax by making electronic tax payments and applying credits as follows:

| Payment Type | Date | Amount |
| --- | --- | --- |
| Estimated Tax | Jan. 18, 2011 | $90,000,000 |
| Estimated Tax | Jan. 18, 2011 | 80,000,000 |
| Estimated Tax | Jan. 18, 2011 | 90,000,000 |
| Estimated Tax | Mar. 15, 2011 | 96,000,000 |
| Estimated Tax | Mar. 15, 2011 | 85,000,000 |
| Estimated Tax | Mar. 15, 2011 | 98,000,000 |
| Estimated Tax | Mar. 15, 2011 | 97,000,000 |
| Estimated Tax | Mar. 15, 2011 | 99,000,000 |
| Estimated Tax | June 15, 2011 | 90,000,000 |
| Estimated Tax | June 15, 2011 | 90,000,000 |
| Prior Year Credit | Jan. 15, 2011 | 109,015,127 |
| Estimated Tax | Sept. 12, 2011 | 90,000,000 |
| Estimated Tax | Sept. 12, 2011 | 11,000,000 |
| Estimated Tax | Sept. 12, 2011 | 90,000,000 |
| Estimated Tax | Sept. 12, 2011 | 90,000,000 |
| Estimated Tax | Sept. 12, 2011 | 90,000,000 |

142.    On May 21, 2015, Visa timely filed a refund claim for its tax year ended September 30, 2011 on Form 1120X, Amended U.S. Corporation Income Tax Return (the "**2011 VisaNet Refund Claim**"), with the IRS Service Center in Ogden, UT. The

2011 Refund Claim (i) included a claim for a $186,782,868 Section 199 Deduction related to VisaNet and (ii) sought a total refund of $110,169,616.

143.    On December 19, 2016, Visa timely filed another refund claim for its tax year ended September 30, 2011 on Form 1120X, Amended U.S. Corporation Income Tax Return (the "**2011 Cybersource Refund Claim**"), with the IRS Service Center in Ogden, UT. The 2011 Cybersource Refund Claim (i) included an additional $12,028,447 Section 199 Deduction related to Cybersource and (ii) sought a total additional refund of $13,726,477.

144.    On February 22, 2018, Visa timely filed an amendment to the 2011 VisaNet Refund Claim and the 2011 Cybersource Refund Claim (together, the "**2011 Refund Claims**") with the IRS Service Center in Ogden, UT. The amendment provided additional explanation of the grounds for the 2011 Refund Claims.

145.    Following an examination and administrative appeals process, on August 16, 2022, Visa filed an amendment to the 2011 Refund Claims with the IRS Service Center in Ogden, UT. The amendment confirmed that the positions taken by Visa during the examination and administrative appeal process were incorporated as grounds for the refund claims.

146.    On October 12, 2022, the IRS sent Visa Letter 1363, Appeals Partial Disallowance of Refund Claim—Certified Letter, denying the portion of the 2011 VisaNet Refund Claim related to the Section 199 Deduction (the "**2011 VisaNet Partial Denial Letter**"). The letter explained the denial as follows:

> It is determined that you are not allowed the $186,782,868 domestic production activities deduction raised in your claim for the tax year ended September 30, 2011 because you have not

> established that you meet the requirements for the deduction under
> Section 199 of the Internal Revenue Code.

The 2011 VisaNet Partial Denial Letter (i) allowed a refund of $47,566,951 unrelated to the Section 199 Deduction and (ii) denied the part of the refund claim related to the Section 199 Deduction.

147.    On October 12, 2022, the IRS sent Visa Letter 1363, Appeals Partial Disallowance of Refund Claim—Certified Letter, denying the portion of the 2011 Cybersource Refund Claim related to the Section 199 Deduction (the "**2011 Cybersource Partial Denial Letter**"). The letter explained the denial as follows:

> It is determined that you are not allowed the $12,028,447 domestic
> production activities deduction raised in your claim for the tax year
> ended September 30, 2011 because you have not established that
> you meet the requirements for the deduction under Section 199 of
> the Internal Revenue Code.

The 2011 Cybersource Partial Denial Letter (i) allowed a refund of $9,135,465 unrelated to the Section 199 Deduction and (ii) denied the part of the refund claim related to the Section 199 Deduction.

148.    For its tax year ended September 30, 2011 (i) Visa was entitled to a Section 199 Deduction of $186,782,868 (or such other amount as properly determined by law) related to VisaNet, (ii) Visa is entitled to a refund of $65,374,004 (or such other amount as properly determined by law) related to VisaNet attributable to that deduction, (iii) Visa was entitled to an additional Section 199 Deduction of $12,028,447 (or such other amount as properly determined by law) related to Cybersource, and (iv) Visa is entitled to an additional refund of $4,209,956 (or such other amount as properly determined by law) related to Cybersource attributable to that deduction.

### v.    Tax Year ended September 30, 2012

149.    Visa timely filed Form 1120, U.S. Corporation Income Tax Return, for its tax year ended September 30, 2012 on June 14, 2013 (the "**Original 2012 Return**") with the IRS Service Center in Ogden, UT. The Original 2012 Return did not claim the Section 199 Deduction.

150.    The Original 2012 Return reported total tax of $1,561,955,893. Visa timely paid this tax by making electronic tax payments and applying credits as follows:

| Payment Type | Date | Amount |
|---|---|---|
| Estimated Tax | Jan. 17, 2012 | $99,000,000 |
| Estimated Tax | Jan. 17, 2012 | 99,000,000 |
| Estimated Tax | Jan. 17, 2012 | 57,000,000 |
| Estimated Tax | Jan. 17, 2012 | 99,000,000 |
| Estimated Tax | Mar. 15, 2012 | 99,999,999 |
| Estimated Tax | Mar. 15, 2012 | 99,999,999 |
| Estimated Tax | Mar. 15, 2012 | 98,000,004 |
| Estimated Tax | Mar. 15, 2012 | 99,999,999 |
| Estimated Tax | Mar. 15, 2012 | 99,999,999 |
| Estimated Tax | June 15, 2012 | 90,000,000 |
| Estimated Tax | June 15, 2012 | 70,000,000 |
| Estimated Tax | June 15, 2012 | 90,000,000 |
| Estimated Tax | June 15, 2012 | 90,000,000 |
| Estimated Tax | June 15, 2012 | 90,000,000 |
| Prior Year Credit | Jan. 15, 2012 | 69,957,137 |
| Estimated Tax | Sept. 17, 2012 | 90,000,000 |
| Estimated Tax | Sept. 17, 2012 | 55,000,000 |
| Estimated Tax | Sept. 17, 2012 | 90,000,000 |
| Estimated Tax | Sept. 17, 2012 | 90,000,000 |
| Estimated Tax | Sept. 17, 2012 | 90,000,000 |

151.     On February 22, 2018, Visa timely filed a refund claim for its tax year ended September 30, 2012 on Form 1120X, Amended U.S. Corporation Income Tax Return (the "**2012 Refund Claim**"), with the IRS Service Center in Ogden, UT. The

2012 Refund Claim (i) included a claim for a $227,085,098 Section 199 Deduction and (ii) sought a total refund of $93,074,560.

152.    Following an examination and administrative appeals process, on August 16, 2022, Visa filed an amendment to the 2012 Refund Claim with the IRS Service Center in Ogden, UT. The amendment confirmed that the positions taken by Visa during the examination and administrative appeal process were incorporated as grounds for the refund claim.

153.    On October 5, 2022, the IRS sent Visa Letter 1363, Appeals Partial Disallowance of Refund Claim—Certified Letter, denying the portion of the 2012 Refund Claim related to the Section 199 Deduction (the "**2012 Partial Denial Letter**"). The letter explained the denial as follows:

> It is determined that you are not allowed the $227,085,098 domestic production activities deduction raised in your claim for the tax year ended September 30, 2012 because you have not established that you meet the requirements for the deduction under Section 199 of the Internal Revenue Code.

The 2012 Partial Denial Letter (i) allowed a refund of $18,778,892 unrelated to the Section 199 Deduction and (ii) denied the part of the refund claim related to the Section 199 Deduction.

154.    For its tax year ended September 30, 2012 (i) Visa was entitled to a Section 199 Deduction of $227,085,098 (or such other amount as properly determined by law) and (ii) Visa is entitled to an additional refund of $79,479,784 (or such other amount as properly determined by law) attributable to that deduction.

### vi.    Tax Years ended September 30, 2013, September 30, 2014, and September 30, 2015

155.    Visa timely filed Form 1120, U.S. Corporation Income Tax Return, for its tax year ended September 30, 2013 on June 13, 2014 (the "**Original 2013 Return**") with the IRS Service Center in Ogden, UT. The Original 2013 Return claimed a $116,205,373 Section 199 Deduction.

156.    Visa timely filed Form 1120, U.S. Corporation Income Tax Return, for its tax year ended September 30, 2014 on June 11, 2015 (the "**Original 2014 Return**") with the IRS Service Center in Ogden, UT. The Original 2014 Return claimed a $307,617,595 Section 199 Deduction related to VisaNet. Visa subsequently made an informal claim for an additional $20,745,675 Section 199 Deduction related to Cybersource.

157.    Visa timely filed Form 1120, U.S. Corporation Income Tax Return, for its tax year ended September 30, 2015 on June 13, 2016 (the "**Original 2015 Return**") with the IRS Service Center in Ogden, UT. The Original 2015 Return claimed a $320,473,067 Section 199 Deduction.

158.    Following an examination and administrative appeals process, on October 4, 2022, the IRS issued Letter 901, Notice of Deficiency, for Visa's tax years ended September 30, 2013, September 30, 2014, and September 30, 2015 (the "**13–15 Notice of Deficiency**").

159.    The 13–15 Notice of Deficiency disallowed Visa's claimed Section 199 Deduction for each tax year. In addition, it made related adjustments to Visa's Foreign Tax Credit and Foreign Source Income amounts. As a result of those adjustments, the IRS determined following deficiencies in tax:

| Tax Year Ended | Balance Due |
|---|---|
| Sept. 30, 2013 | $36,931,948 |
| Sept. 30, 2014 | $102,848,933 |
| Sept. 30, 2015 | $120,722,731 |

160.    On November 18, 2022, Visa paid the full amounts of the asserted deficiencies for its September 30, 2013, September 30, 2014, and September 30, 2015 tax years.

161.    As explained in parts IV.B.vi.a through IV.B.vi.c below, Visa submitted subsequently filed timely refund claims for those amounts, and the IRS denied those claims.

### a.    Tax Year ended September 30, 2013

162.    On November 22, 2022, Visa timely filed a refund claim for its tax year ended September 30, 2013 on Form 1120X, Amended U.S. Corporation Income Tax Return (the "**2013 Refund Claim**"), with the IRS Service Center in Ogden, UT. The 2013 Refund Claim (i) included a claim for a $116,205,373 Section 199 Deduction and (ii) sought a total refund of $36,931,948.

163.    On January 31, 2023, the IRS sent Visa Letter 105C, Claim Disallowed, denying the 2013 Refund Claim in full.

164.    For its tax year ended September 30, 2013, (i) Visa was entitled to a Section 199 Deduction of $116,205,373 (or such other amount as properly determined by law) and (ii) Visa is entitled to a refund of $36,931,948 (or such other amount as properly determined by law) attributable to that deduction.

**b.   Tax Year ended September 30, 2014**

165.   On November 22, 2022, Visa timely filed a refund claim for its tax year ended September 30, 2014 on Form 1120X, Amended U.S. Corporation Income Tax Return (the "**2014 Refund Claim**"), with the IRS Service Center in Ogden, UT. The 2014 Refund Claim (i) included a claim for a $307,617,595 Section 199 Deduction related to the VisaNet software, (ii) included a claim for a $20,745,675 Section 199 Deduction for the Cybersource Software (previously submitted as an informal claim by Visa and not allowed by the Commissioner), and (iii) sought a total refund of $110,109,919.

166.   On January 31, 2023, the IRS sent Visa Letter 105C, Claim Disallowed, denying the 2014 Refund Claim in full.

167.   For its tax year ended September 30, 2014, (i) Visa was entitled to a Section 199 Deduction of $328,363,269 (or such other amount as properly determined by law) and (ii) Visa is entitled to a refund of $110,109,919 (or such other amount as properly determined by law) attributable to that deduction.

**c.   Tax Year ended September 30, 2015**

168.   On November 22, 2022, Visa timely filed a refund claim for its tax year ended September 30, 2015 on Form 1120X, Amended U.S. Corporation Income Tax Return (the "**2015 Refund Claim**"), with the IRS Service Center in Ogden, UT. The 2015 Refund Claim (i) included a claim for a $320,473,067 Section 199 Deduction and (ii) sought a total refund of $120,722,731.

169.   On January 31, 2023, the IRS sent Visa Letter 105C, Claim Disallowed, denying the 2015 Refund Claim in full.

170.    For its tax year ended September 30, 2015 (i) Visa was entitled to a Section 199 Deduction of $320,473,067 (or such other amount as properly determined by law) and (ii) Visa is entitled to a refund of $120,722,731 (or such other amount as properly determined by law) attributable to that deduction.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in its favor in the amount of $519,577,021 or such other amount as properly determined by law for amounts due Plaintiff, plus any additional amounts, including interest and costs, allowed by law, and such other relief as the Court may deem just.

DATED: June 21, 2024

Respectfully submitted,

Thomas Kittle-Kamp
IL Bar No. 6198802
Attorney for Plaintiff
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 701-7028
Fax: (312) 706-9197
Email: tkittlekamp@mayerbrown.com

OF COUNSEL:

Paul A. DiSangro
CA Bar No. 202256
Mayer Brown LLP
575 Market Street, Suite 2500
San Francisco, CA 94105
Telephone: (650) 331-2045
Email: pdisangro@mayerbrown.com

Geoffrey M. Collins
NY Bar No. 5619713
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2633
Email: gcollins@mayerbrown.com

Jeremy D. Himmelstein
DC Bar No. 1742839
Mayer Brown LLP
1999 K Street NW
Washington DC 20006
Telephone: (202) 263-3326
Email: jhimmelstein@mayerbrown.com

Brian W. Kittle
NY Bar No. 4200556
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2187
Email: bkittle@mayerbrown.com

Maria Concheta Critelli
IL Bar No. 6331964
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 701-7424
Email: mcritelli@mayerbrown.com